UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
RICHARD K. and JULIE K., individually and as                            :
guardians of K.K., a minor,                                             :
                                                                        :
                        Plaintiffs,                                     :
                                                                        :
            -v-                                                         :        18 Civ. 6318 (JPC) (BCM)
                                                                        :
UNITED BEHAVIORAL HEALTH and OXFORD                                     :        OPINION AND ORDER
HEALTH INSURANCE OF NEW YORK/PPO,                                       :
                                                                        :
                        Defendants.                                     :
                                                                        :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

  When a patient responds well to treatment, it is natural to want to keep them where they

are.  But under many employee welfare benefit plans, treatment is covered only so long as it

remains medically necessary.  And a level of treatment usually stops being medically necessary at

the time when the patient can be safely and effectively cared for in a less intensive or less costly

environment.  As a result, disputes over healthcare coverage often turn on the question of when

(or whether) the patient reached that stage.

  In this case, Richard K. and Julie K.'s then-teenage daughter, K.K., tried to kill herself by

drinking a bottle of window cleaner.  While she thankfully survived, K.K. continued to struggle

with suicidal thoughts and a host of other behavioral and emotional problems in the aftermath of

her attempt.  So to help her get better, Richard and Julie sought coverage for K.K. to be treated at

a residential treatment center that provided around-the-clock structure and one-on-one monitoring.

Because the cost of K.K.'s treatment was covered under the terms of Richard's employee welfare

benefit plan, the plan's claims administrator approved as medically necessary a twenty-six-day stay at the treatment center.

While at the treatment center, K.K.'s mental health improved.  By the end of the twenty-six days, her mood and affect were within normal limits, and she displayed no feelings of hopelessness.  K.K. also had a linear, logical thought process without any paranoia or delusions. And despite continuing to show defiance toward authority figures, she functioned fine during her day-to-day life and generally participated well in her treatment programs.  To be sure, K.K. also harmed herself during her stay, requiring precautionary measures early on.  Yet by the end, her thoughts of suicide had gone away completely, and she no longer needed one-on-one observation. So the claims administrator determined that K.K.'s treatment should continue through a less intensive partial hospitalization program, and denied coverage for the cost of residential treatment as no longer medically necessary.  That determination was later upheld on internal appeal and externally corroborated by an independent psychiatrist.

Richard and Julie disagreed.  And they decided that despite a potential lack of coverage, it was best to keep K.K. where she was for a few months longer.  They then filed this civil action against the claims administrator and one of its affiliates, seeking to recover the cost of K.K.'s continued stay at the residential treatment center pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA").  But because the Court agrees, following a summary trial on the administrative record, that the evidence supports the claims administrator's determination that K.K.'s treatment should continue in a less intensive setting, the Court will enter judgment in favor of the claims administrator and its affiliate.

# I. Background

## A.    Factual Findings

This Opinion and Order is based on a summary trial concerning Richard and Julie's claim for benefits allegedly owed under an ERISA-regulated employee welfare benefit plan.  Because the parties in this case have each consented for the Court to resolve Richard and Julie's claim for benefits through the procedure of a summary trial, Dkt. 78 ¶ 5, the Court must make factual findings based on the Administrative Record before determining whether Richard and Julie are entitled to the benefits they seek.[1]  *O'Hara v. Nat'l Union Fire Ins. Co.*, 642 F.3d 110, 116 (2d Cir. 2011); *Muller v. First Unum Life Ins. Co.*, 341 F.3d 119, 124 (2d Cir. 2003) (describing a summary trial in the ERISA context as "essentially a bench trial 'on the papers' with the District Court acting as the finder of fact").  In doing so, the Court "must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."  Fed. R. Civ. P. 52(a)(1); *Muller*, 341 F.3d at 124 ("[A]fter conducting a bench trial, the District Court has an obligation to make explicit findings of fact and conclusions of law explaining the reasons for its decision.").  The Court finds the following facts based on the documents contained in the stipulated Administrative Record.

---

[1] Citations to "AR" are to the Bates-stamped documents in the sealed Administrative Record beginning with the prefix "UNITED."  Dkt. 77.  The parties have stipulated "to the authenticity and completeness of the Administrative Record."  Dkt. 78 ¶ 3.  Citations to "Pls. SUMF" are to Richard and Julie's Statement of Undisputed Material Facts, Dkt. 81-1.  That Statement is cited herein when the referenced fact is not in dispute.  *See* Dkt. 95 (Defendants' counterstatement).

## 1. Richard's Employee Welfare Benefit Plan

At all relevant times, Richard was enrolled as a participant in the Kris Fuchs International Freedom PPO Gold Plan (the "Plan"), an ERISA-regulated "employee welfare benefit plan." 29 U.S.C. § 1002(1); *see* AR at 2-8, 15; Pls. SUMF ¶ 3.  Benefits under the Plan were funded by a group policy of insurance issued by Oxford Health Insurance, Inc. ("Oxford"), AR at 40, and United Behavioral Health ("United") served as the Plan's third-party claims administrator, *see id.* at 215-216; Pls. SUMF ¶ 4.  As the claims administrator, United was "responsible for making benefit coverage determinations for mental health and substance abuse services that are provided to Oxford Health Insurance NY/PPO members."  AR at 215.  K.K. was a beneficiary under the Plan at all relevant times.  Pls. SUMF ¶ 3.

The Plan provides coverage for health care services, procedures, treatments, tests, devices, and prescription drugs only when "Medically Necessary."  AR at 51 (providing that "Covered Services" must be "Medically Necessary").  Under the terms of the Plan, services are deemed Medically Necessary only if each of the following conditions is met:

- They are clinically appropriate in terms of type, frequency, extent, site, and duration, and considered effective for [the patient's] illness, injury, or disease;
- They are required for the direct care and treatment or management of that condition;
- [The patient's] condition would be adversely affected if the services were not provided;
- They are provided in accordance with generally-accepted standards of medical practice;
- They are not primarily for the convenience of [the patient], [the patient's] family, or [the patient's healthcare provider];
- They are not more costly than an alternative service or sequence of services, that is at least as likely to produce equivalent therapeutic or diagnostic results;
- When setting or place of service is part of the review, services that can be safely provided to [the patient] in a lower cost setting will not be Medically Necessary if they are performed in a higher cost setting.  For example [the Plan] will not provide coverage for an inpatient admission for surgery if the surgery could have been performed on an outpatient basis.

*Id.* at 52.  And in determining whether services are Medically Necessary, the Plan explains that the claims administrator may consider, among other things, a patient's medical records, the opinion of the patient's medical provider, "medical policies and clinical guidelines," and "[p]rofessional standards of safety and effectiveness, which are generally[] recognized in the United States for diagnosis, care, or treatment."  *Id.*

United relies on more specific guidelines, known as the Optum Level of Care Guidelines (the "Optum Guidelines"), to assist it in determining whether coverage for mental health treatment at a Residential Treatment Center is Medically Necessary under the Plan.  Pls. SUMF ¶ 44 ("United used the [Optum Guidelines] to determine whether residential mental health treatment was medically necessary."); *see* AR at 1553-63.[2]  For admission to a Residential Treatment Center to be appropriate, the patient must satisfy certain general criteria applicable to all levels of care, and must "not [be] in imminent or current risk of harm to self, others, and/or property."  AR at 1553. In addition, "[t]he 'why now' factors leading to admission" must not be capable of being "safely, efficiently or effectively assessed and/or treated in a less intensive setting due to acute changes in the member's signs and symptoms and/or psychosocial and environmental factors."  *Id.*; *see also id.* at 1556 (requiring that the patient's "current condition cannot be safely, efficiently, and

---

[2] The Optum Guidelines define a Residential Treatment Center as a "sub-acute facility-based program which delivers 24-hour/7-day assessment and diagnostic services, and active behavioral health treatment to members who do not require the intensity of nursing care, medical monitoring and physician availability offered in Inpatient."  AR at 1553.  The Optum Guidelines further explain that "[t]he course of treatment in a Residential Treatment Center is focused on addressing the 'why now' factors that precipitated admission (e.g., changes in the member's signs and symptoms, psychosocial and environmental factors, or level of functioning) to the point that the member's condition can be safely, efficiently and effectively treated in a less intensive level of care."  *Id.*

effectively assessed and/or treated in a less intensive level of care").[3]  That standard can be satisfied when there is (1) "[a]cute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the [patient] or others is endangered" or (2) "[p]sychosocial and environmental problems that are likely to threaten the [patient's] safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care."  *Id.*  at 1553.

For continued placement at a Residential Treatment Center to remain appropriate, the patient must also satisfy a set of criteria applicable to all levels of care, and the continued treatment must not be "primarily for the purpose of providing custodial care."  *Id.* at 1554.  The common criteria applicable to continued service include a requirement that "[t]he admission criteria continue to be met."  *Id.* at 1557.  As a result, continuation at a Residential Treatment Center, like admission to one in the first place, requires both that the patient is not "in imminent or current risk of harm to self, others, and/or property" and that the factors leading to admission cannot be "safely, efficiently or effectively assessed and/or treated in a less intensive setting."  *Id.* at 1553; *see also id.* at 1556.

### 2.  K.K.'s Mental Health Treatment

Richard and Julie's then-teenage daughter, K.K., suffered from serious mental health problems in 2014 and 2015.[4]  Her problems date back to middle school, where she struggled to get

---

[3] As noted in the Optum Guidelines' definition of "Residential Treatment Center," a patient's "why now" factors can include "changes in the [patient's] signs and symptoms, psychosocial and environmental factors, or level of functioning" leading them to seek admission to a treatment program.  AR at 1553.

[4] United and Oxford object on relevance grounds to almost all facts concerning K.K.'s mental health status prior to January 2015.  *See* Dkt. 95 at 3-9.  The Court broadly agrees, for reasons that it will explain in setting forth its legal conclusions, that most of these earlier facts have only minimal probative value in assessing whether K.K. required residential treatment as of March

along with her peers and suffered months of bullying.  *Id.* at 227.  Eventually, in January 2013, K.K.'s parents transferred her to Christ Lutheran School, a private middle school in Phoenix, Arizona.  *Id.*  But K.K. did not fare much better there, and engaged in self-harm to cope with continued bullying.  *Id.*  By the spring of 2014, counselors at Christ Lutheran School observed that K.K. had "academic and social issues" and recommended that she "receive a full psychiatric evaluation and check into a clinic to discuss and deal with the aspects and issues in her head and on her mind."  *Id.* at 247.

On May 12, 2014, K.K.'s parents admitted her to "Paradigm Malibu: Teen Depression & Rehab" ("Paradigm Malibu") for a six-week stay.  *Id.* at 227, 249.  The "Master Treatment Plan" created in connection with K.K.'s admission to Paradigm Malibu listed her diagnoses as including a delusional disorder and a recurrent major depressive disorder, and summarized her mental health status as follows:

> [K.K.'s] diagnosis recently changed from Anxiety and Eating Disorder to Delusional Disorder.  [K.K.] is displaying behavior that is incongruent with reality.  [K.K.] appears more delusional in how she perceives attention from males, the incorrect history regarding her family, and some of the blatant lies she tells on a daily basis. [K.K.] is displaying behavior that is evidence she is not fully experiencing reality. [K.K.] displays other delusional behavior such as inappropriate jealousy of her dad's girlfriend and other interpretation of reality that cannot be explained.  For criteria, [K.K.'s] delusions are based in real life events but they have not happened to her. Although her parents and staff have initially assumed that this was based in lies and manipulation, it now appears that [K.K.] has little control over the delusions that she is experiencing/creating.

*Id.* at 249.  The same Master Treatment Plan described the reasons for K.K.'s admission to Paradigm Malibu as including "a recent decline in her functioning as evidenced by thoughts of suicide, self-harm through cutting, and restriction/purging related to eating."  *Id.*  With respect to

---

19, 2015.  But that is a question of weight, not admissibility.  Plus, these facts are based on parts of the Administrative Record that United considered in making its coverage determination, so they are proper for the Court to consider as well.  The objections are therefore overruled.

K.K.'s major depressive disorder, the document further explained that she suffered from, among other things, a depressed and irritable mood, insomnia, feelings of worthlessness, and recurrent thoughts of death.  *Id.* at 252.

Paradigm Malibu discharged K.K. on June 24, 2014, following a forty-four-day stay.  *Id.* at 255.  Her "Discharge Summary" repeated the same explanations of her diagnoses and reasons for admission contained in her Master Treatment Plan and noted that K.K. had made varying degrees of progress on her mental health issues.  *Id.* at 255-57.  But despite observing some signs of progress while at Paradigm Malibu, the Discharge Summary stated that K.K. would "need ongoing therapy and an appropriate school placement with an individualized education plan."  *Id.* at 257; *see also id.* at 227 (noting that the Paradigm Malibu treatment team recommended "to get [K.K.] into a new middle school, so she could have a fresh start").[5]  To that end, Paradigm Malibu "recommended to [K.K.] and her parents . . . that [K.K.] continue with individual therapy and an Intensive Outpatient Program."  *Id.* at 257.  The document noted that "[K.K.'s] first session will be with Owen Golden at AZ Behavioral Health Specialists" on June 27, 2014.  *Id.*  Mr. Golden was a Licensed Clinical Social Worker.  *Id.* at 261.

Consistent with Paradigm Malibu's recommendation, K.K.'s parents enrolled her in a new middle school in Phoenix and she began therapy with Mr. Golden, who treated her "on a regular basis until December 16, 2014."  *Id.* at 227-28, 261.  During this time, K.K. continued to struggle with self-harm and was sexually abused by a fifteen-year-old boy whom she had befriended.  *Id.* at 228.  K.K. also threatened to commit suicide around this time.  *Id.*

---

[5] Richard and Julie would later assert that K.K.'s treatment at Paradigm Malibu "was not successful" and "actually made [K.K.] worse" in some ways.  AR at 1210.

K.K.'s parents decided that she "needed help for her depression and abuse . . . before her mental status deteriorated any further." *Id.* So on or around January 6, 2015, Richard and Julie enrolled K.K. at Sedona Sky Academy ("Sedona"), a Residential Treatment Center located in Arizona that specializes in providing mental health treatment and educational services to adolescents. *Id.* at 228, 1481.

K.K. struggled during the first month-and-a-half of her time at Sedona. On February 15, 2015, she "consumed half a bottle of window cleaner during dorm clean-up." *Id.* at 1228. Following that apparent suicide attempt, which left K.K. hospitalized for about a week and required crisis stabilization, United approved coverage under the Plan for K.K. to undergo residential treatment at Sedona from February 21 onward. *Id.* at 202, 1190, 1209-10, 1221. When K.K.'s coverage at Sedona began on February 21, she suffered from a mood disorder, oppositional-defiance disorder, and a parent-child relational problem. *Id.* at 1076. Her reasons for admission also included issues with self-esteem and inappropriate peer relationships. *Id.* As of February 22, K.K.'s medical records reflected that she had been admitted to the hospital for suicidal ideation following the February 15 incident, had a history of self-harm, and had "frequent conflicts with adults in general and with teachers," including with her parents. *Id.* at 1209. As a result, K.K. required precautionary measures and observation upon her readmission to Sedona, including one-on-one observation. *Id.* at 1190, 1204, 1209-10.

K.K.'s time at Sedona between February 21, 2015, and March 18, 2015, was full of behavioral and emotional ups and downs, but is ultimately reflective of steady, significant progress on her mental health.

To begin, K.K.'s participation in her treatment programs was usually good. For example, K.K.'s participation in leadership skill building activities—which were meant to help her to

"develop skills, knowledge and behaviors for daily living and community involvement"—was generally consistent throughout her covered period of treatment at Sedona. *See, e.g.*, *id.* at 1066, 1097, 1119, 1144, 1173, 1218. *But see id.* at 1154 (noting that K.K. was unable to participate in leadership skill building that day because she was on precautionary status); *id.* at 1160 (same). K.K. also generally participated well in exercises designed to encourage goal-setting and progression toward individual achievement. *See, e.g.*, *id.* at 1070, 1113, 1156, 1180, 1200, 1217. And K.K. had little to no issues with sleep in February and March. *See, e.g.*, *id.* at 1061, 1098, 1148, 1170, 1192, 1213.

Notes from K.K.'s therapist from the first week of her coverage period paint a mixed picture of her engagement in therapy. In late February, K.K.'s therapist described her engagement in treatment as "moderate[]," noting that "[s]he understands that she has problems that she needs to work on" but that "she also seems slow to get things done and gets easily discouraged." *Id.* at 1210. K.K. also "[p]artially desire[d] treatment for and partially underst[ood] the nature" of her problems. *Id.* Other notes from therapy sessions conducted in late February noted that K.K. did "not feel ready to come off 1 to 1 observation as she still [felt] that she may do something impulsive, like running [off] campus or drinking cleaner," and that she showed "little motivation and solution focus." *Id.* at 1204. K.K.'s mood during this time was described by her therapists as "[n]umb" and "[a]pathetic," and her affect as "[a]ppropriate," but "blunted." *Id.* at 1204, 1210. Her mood was also described as "[d]epressed." *Id.* at 1190. K.K.'s participation in therapy during late February was generally good, *id.* at 1198, 1203, although she was asked to leave one session with her mother "due to persistent lack of efficient communication," *id.* at 1184.

K.K.'s mood and behavior during late February and early March had ups and downs. For example, on February 21, K.K. was "very down in the dumps [in] the early part of the shift but []

got better after talking with staff and students." *Id.* at 1214. On February 22, K.K.'s therapist noted that she encountered "frequent interpersonal conflict with students and staff" and had significant relationship issues with her mother. *Id.* at 1210. That account echoed the views of Sedona's staff members, one of whom observed, also on February 22, that K.K. needed "to improve in her willingness to accept instructions from staff without taking it so personally or getting very frustrated by it." *Id.* at 1208; *see also id.* at 1201 (noting on February 23 that K.K. was being uncooperative and argumentative with staff); *id.* at 1196 (noting on February 25 that K.K. "[w]ould only listen to certain staff" and did not "do what other staff asked"); *id.* at 1166 (describing K.K.'s behavior during an academic support session on March 1 as "a little restless and antagonistic"); *id.* at 1125 (describing K.K.'s attitude toward staff on March 8 as "very defiant" and "very disrespectful"); *id.* at 1110 (noting on March 11 that K.K. attempted to abscond from Sedona). K.K.'s therapist therefore noted, on March 9, that she "exhibit[ed] a persistent pattern of not following staff direction" and was "being very defiant with staff." *Id.* at 1120.

At other times, however, K.K.'s behavior and mood were both fine. *See, e.g.*, *id.* at 1199 (stating on February 24 that K.K. followed protocol and "had a great attitude with staff/students"); *id.* at 1192 (noting on February 26 that K.K. "was very nice to her community as well as staff"); *id.* at 1179 (describing K.K. on February 27 as "[v]ery comforting" and as a "sweet and good friend" to one of her peers); *id.* at 1137 (noting on March 6 that K.K. "[h]ad a good day" with "[n]o issues"); *id.* at 1135 (noting on March 7 that K.K. was in "good spirits," "[f]ollowed staff direction," and had "[n]o issues"); *id.* at 1128 (describing on March 8 that K.K. was "helpful to staff" and "[s]eemed to do very good today"). As one Sedona staff member summarized on March 1, K.K. "ha[d] shown some improvements in her behavior in obeying guidelines and attitude

11

towards staff, but still could improve more in this area," was "a good support and caring" to her peers, and had a "strong character." *Id.* at 1165.

K.K. struggled with self-harm in March. On March 1, she told another student at Sedona that "she wanted to cut" herself, although the staff member noted that K.K. "[a]ppeared to be trying to get out of cleaning" her room. *Id.* at 1168. Later that day, however, K.K. did harm herself "us[ing] an earring she found," and was placed on "level 3 precautionary status for self harm" as a result. *Id.* at 1167. The following day, K.K. discussed her "self-harm relapse" with her therapist, and explained that she still felt unready to leave one-on-one observation due to feeling that she "may do something impulsive, like running [off] campus or doing further cutting." *Id.* at 1161. Sedona staff also observed that K.K. cut herself "during her shower with an [earring]" on March 2. *Id.* at 1158. Then, on March 3, K.K. told Sedona staff that she was still "having thoughts of cutting." *Id.* at 1152-53. But following these events, K.K.'s mental health continued to improve, and by on or around March 7, K.K. no longer needed precautionary measures. *Id.* at 1120.

By later in March, K.K.'s mental health and behavior had improved significantly. On March 17, Sedona staff observed that K.K. was "[t]alkative and friendly" and "[m]ore cooperative with staff then she [had] been in the past." *Id.* at 1071. A psychiatric consultation dated March 19 found that K.K.'s affect and mood were both within normal limits, and that K.K.'s thought process was linear and logical with no paranoia or delusions. *Id.* at 1059-60. The mental status exam from that consultation showed that K.K. no longer had any suicidal ideation and had no psychosis. *Id.* at 1059. That consultation further assessed that K.K.'s depressive disorder had improved. *Id.* Those records additionally noted that K.K. reported improvements in her "outlook" and grades, and had stated that she was "less irritable and better able to contain her impulses." *Id.* The records again noted that K.K. denied any suicidal ideation or "hopelessness." *Id.*

On March 22, however, Sedona staff reported that K.K. "was very upset" and told them that "she had self harmed about 4 days ago" on her "upper thigh." *Id.* at 1039. K.K. also told staff that she "always [had] the urge" to self-harm, but that she "was not having any feeling then of self-harming." *Id.*

But in the aftermath of that incident, K.K. continued getting better and showed no further signs of risk to herself.[6] Unlike with respect to K.K.'s prior episodes of self-harm, Sedona saw no need to place her on precautions, and she instead continued participating in activities as normal. *See, e.g.*, *id.* at 1055, 1051-53, 1046-47, 1041-42, 1038, 1034. And notes from K.K.'s March 23 individual therapy session did not mention any ongoing issues with self-harm, focusing instead on a "strategy of [] how to avoid [] engaging in argumentation with adults" and noting that K.K. received feedback to help her progress to the next phase of her treatment program. *Id.* at 1036.[7] Sedona staff also highlighted positive developments regarding her mood and behavior, indicating substantial improvement. *See, e.g.*, *id.* at 1040 (recommending on March 22 that K.K. advance to the next phase of her program as a result of continued improvement and her ability to "fully embrace the responsibilities and freedoms that accompany" the next stage of the program); *id.* at 1037 (describing K.K. on March 23 as "[b]ubbly," "talkative," and in a "good mood"); *id.* at 1032 (noting on March 23 that K.K. "seemed to be in a very good mood" and "was very polite and

---

[6] Richard and Julie contend that the question of coverage turns on K.K.'s mental health status as of March 19, 2015, not any later date. Nevertheless, as the Court will explain, K.K.'s post-March 19 medical records are relevant insofar as they shed some light on the nature of the alleged incident of self-harm that was reported on March 22 and whether that incident supports that residential treatment was Medically Necessary as of March 19.

[7] The only mention of self-harm in K.K.'s therapy notes in the days after the March 22 report was in a March 26 note, which stated that K.K. felt "as if she can go to staff if she feels she has thoughts of self harm" but also noted that her mood and affect were within normal limits and that K.K. exhibited no suicidal ideation. AR at 1010. Much later, on April 22, 2015, K.K. told a Sedona staff member that she "wanted to be placed on staff watch," but provided no reason for that request beyond feeling "like too much was going on." *Id.* at 841.

helpful [to] staff" with "[n]o issues"); *id.* at 1019 (noting on March 25 that K.K. "was her normal spunky, zealous self, happy and poised"). And although some staff members noted continuing behavioral and emotional challenges, including defiance and disrespect towards staff, *see, e.g.*, *id.* at 1021-23, another staff member highlighted on March 23 that K.K. was "[b]eginning to show signs of leadership in therapy, community, and classroom"; "[f]requently manage[d] her behavior through healthy, honest & expressive techniques"; was "[o]ften [] courteous, considerate and respectful of self and others"; and had "developed an attitude of hopefulness for her future." *Id.* at 1033. *But see id.* at 1021-22 (other Sedona staff members disagreeing with those assessments in part). K.K. was then allowed to move up to the next phase of her program on March 25. *Id.* at 1017, 1027; Pls. SUMF ¶ 28. K.K. also generally continued sleeping well, though she did report some trouble falling asleep on March 26. AR at 1010.

K.K. continued to improve through July 2015, though some behavioral and emotional issues persisted. Pls. SUMF ¶ 28. K.K. remained at Sedona until August 4, 2015, when she was discharged to a less intensive level of care. AR at 263-65; Pls. SUMF ¶ 28.

### 3. United's Decision to Continue Coverage at a Less Restrictive Level of Care

Dr. Satwant Ahluwalia, an Associate Medical Director at United, determined that K.K.'s mental health treatment could continue through a less restrictive partial hospitalization program and issued an Initial Adverse Determination through a letter dated March 20, 2015. AR at 215-16. Dr. Ahluwalia's letter offered the following explanation for the determination that coverage at Sedona was not available under the Plan:

> I based this decision on the clinical information provided and [the Optum Guidelines] for Mental Health Residential care. The care is not medically necessary. Your child is better able to work on her recovery. She seems to be working better with others and on her recovery goals so that residential care is no longer needed. She does not appear to be at risk of harming [herself] or others. She has no serious medical problems needing 24 hour care. The care she is getting can

14

> happen in a less restrictive program.  It does not look like she would need inpatient care if she were not in the residential program.  Her care can occur in a less restrictive partial hospital program which is available in your area.

*Id.* at 215.  Based on these reasons, Dr. Ahluwalia determined that K.K.'s continued receipt of residential treatment at Sedona was not Medically Necessary under the Plan from March 19, 2015, onward.  *Id.* at 215-16.

Richard and Julie appealed Dr. Ahluwalia's Initial Adverse Determination on September 14, 2015, invoking United's internal appeal process.  *Id.* at 225-36.  Richard and Julie argued that Dr. Ahluwalia erred in determining that continued residential treatment was not Medically Necessary and sought coverage for the remaining period of K.K.'s enrollment at Sedona: March 19, 2015, to August 4, 2015.  *Id.*  In support of that appeal, Richard and Julie attached the following materials: (1) a copy of Dr. Ahluwalia's March 20, 2015, letter setting forth the reasons for United's Initial Adverse Determination, *id.* at 237, 239-41; (2) excerpts of the Optum Guidelines applicable to placement at a Residential Treatment Center, *id.* at 243-45; (3) an August 2015 letter written by Jon Doyle, an assistant principal of Christ Lutheran School, *id.* at 247; (4) K.K.'s Paradigm Malibu Master Treatment Plan, dated May 12, 2014, *id.* at 249-53; (5) K.K.'s Paradigm Malibu Discharge Summary, dated June 24, 2014, *id.* at 255-57; (6) an August 21, 2015, letter authored by Dr. Jeff Nalin, PsyD, and Dr. M. Steven Sager, M.D., who were Paradigm Malibu's clinical director/co-founder and medical director, respectively, *id.* at 259; (7) an August 10, 2015, letter written by Mr. Golden, *id.* at 261; (8) copies of K.K.'s medical records from her time at Sedona, *id.* at 263-1494; and (9) a curated selection of the same medical records from K.K.'s time at Sedona, *id.* at 1496-1526.

United assigned Richard and Julie's appeal to Dr. Theodore Allchin, also an Associate Medical Director at United.  *Id.* at 1537-38.  Dr. Allchin affirmed Dr. Ahluwalia's determination

that continued residential treatment was not Medically Necessary in a letter dated October 15, 2015:

> The member was admitted for treatment of a mood disorder. After reviewing the available information, it is noted she had made progress and that her condition no longer met guidelines for further coverage of treatment in the setting. She had no medical issues. She was not a danger to self or others. She was active in treatment. Symptoms were better. Family was supportive. Care could have continued Mental Health Partial Hospitalization setting.

*Id.* at 1537; *see also id.* at 1538 (Dr. Allchin explaining that under New York law, his resolution of Richard and Julie's appeal was "considered . . . to be a determination of medical necessity").

On January 20, 2016, Richard and Julie requested an "independent external review" of United's adverse benefit determination. *Id.* at 1728-29.[8] In addition to a copy of Dr. Allchin's letter upholding Dr. Ahluwalia's Initial Adverse Determination, *id.* at 1731-45, Richard and Julie attached the same letter and documents to the external appeal that they included in support of their internal appeal, *id.* at 1753-3064. That independent review was procured by a third-party vendor, MCMC, through its Medical Care Ombudsman Program, which was certified by the State of New York to carry out independent reviews of adverse benefit determinations. *Id.* at 1577. After reviewing K.K.'s medical records, the anonymous independent reviewer, who was board certified in psychiatry and child psychiatry, agreed that the Plan did not cover K.K.'s treatment at Sedona after March 18, 2015. *Id.* at 1578-79. In a letter dated February 25, 2016, the independent reviewer concluded:

> The documentation does not reflect acting out behaviors which presented an ongoing significant danger to self or others, which required 24-hour structure and observation for the safety of the patient or others, or which could not have been managed equally safely and effectively in a less restrictive setting in the patient's community with appropriately intensive family involvement.

---

[8] Richard and Julie decided to skip the optional second-level internal appeal allowed under the Plan. AR at 1728-29.

*Id.* at 1582.

## B.    Procedural History

Richard and Julie filed this civil action on July 12, 2018, naming United and Oxford as Defendants.  Dkt. 1.  Through an Amended Complaint filed on October 22, 2018, Richard and Julie assert two causes of action: recovery of benefits under ERISA, 29 U.S.C. § 1132(a)(1)(B), and violations of the Mental Health Parity and Addiction Equity Act of 2008 (the "Parity Act").  Dkt. 32 ¶¶ 65-80.  Richard and Julie principally seek an award of monetary damages representing the amount allegedly owed under the Plan for K.K.'s treatment at Sedona from March 19, 2015, through the time of her discharge on August 4, 2015.  *See id.* ¶ 64, 15.  On September 29, 2020, this case was reassigned from the Honorable Gregory H. Woods to the undersigned.  *See* Notice of Case Reassignment dated Sept. 29, 2020.

Before this matter was reassigned, Judge Woods stayed the case in its entirety pending the outcome of a class action in the Northern District of California, in which K.K. was a member of the certified plaintiff class.  Dkt. 52 at 1; *see Wit v. United Behavioral Health*, No. 14 Civ. 2346 (JCS) (N.D. Cal.).  The Court then ordered that the stay be continued on April 18, 2022, and again on April 4, 2023, pending the outcome of an appeal to the Ninth Circuit in *Wit* and the issuance of the Ninth Circuit's mandate.  Dkts. 63, 65.

Eventually, on November 15, 2023, the Court lifted the stay of this action and set a briefing schedule for a summary trial on the stipulated Administrative Record regarding Richard and Julie's ERISA claim.  Dkt. 69.  With the parties' consent, the Court also dismissed the Amended Complaint's Parity Act claim without prejudice.  *Id.*[9]  The parties filed their opening trial briefs

---

[9] The Court later reaffirmed its dismissal of the Parity Act claim, again with the parties' consent, during a telephonic status conference on November 18, 2024.  *See* Minute Entry, Nov. 18, 2024.

on April 18, 2024.  Dkts. 79 ("Defts. Trial Br."), 81 ("Pls. Trial Br.").  On January 10, 2025—

following the end of yet another stay imposed pending the Ninth Circuit's consideration of a

petition for a writ of mandamus in the *Wit* action, Dkts. 83, 91—the parties filed simultaneous

briefs opposing each other's opening trial briefs.  Dkts. 93 ("Pls. Opp. Br."), 94 (Defendants'

opposition brief).  Then, on January 31, 2025, the parties each filed a reply brief.  Dkts. 98

(Defendants' reply brief), 99 ("Pls. Reply Br.").

On February 18, 2025, the parties filed simultaneous supplemental briefs to address a

number of factual and legal issues raised by the Court regarding the Administrative Record.  Dkts.

103 ("Defts. Supp. Br."), 104 ("Pls. Supp. Br.").  The Court then heard oral argument on February

24, 2025.  Finally, on March 3, 2025, the parties submitted additional supplemental responses to

address an issue raised at oral argument concerning the proper scope of the Court's review of the

Administrative Record.  Dkts. 105 ("Defts. Supp. Br. II"), 106 ("Pls. Supp. Br. II").[10]

## II.  Legal Standard

ERISA allows participants in a covered employee welfare benefit plan to bring a civil

action to recover the value of benefits owed under the plan.  *See* 29 U.S.C. § 1132(a)(1)(B)

(providing that "[a] civil action may be brought . . . to recover benefits due to [a participant or

beneficiary] under the terms of his plan, to enforce his rights under the terms of the plan, or to

clarify his rights to future benefits under the terms of the plan").  Under the usual framework for

---

[10] The parties filed these supplemental briefs to address whether it is proper for the Court to consider the portion of the record containing K.K.'s Pulse Health Management System records, AR at 154-201.  Richard and Julie take the position that the Court may not consider these records because they were not provided to them during the internal review process.  Pls. Supp. Br. II at 1-2.  United and Oxford, by contrast, argue that the Court must take these records into consideration because they are part of the Administrative Record.  Defts. Supp. Br. II at 1-2.  It is not necessary to decide which side is right.  Although these records are probative of K.K.'s condition, they are not outcome determinative in this case.  Accordingly, the Court will evaluate whether United correctly denied Richard and Julie's claim for benefits without relying on this portion of the record.

reviewing a claims administrator's eligibility determination, "'a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' in which case an arbitrary and capricious standard applies." *Halo v. Yale Health Plan, Dir. of Benefits & Recs. Yale Univ.*, 819 F.3d 42, 51 (2d Cir. 2016) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). "The plan administrator bears the burden of proving that the deferential standard of review applies." *Stolarik v. N.Y. Times Co.*, 323 F. Supp. 3d 523, 540 (S.D.N.Y. 2018) (quoting *Fay v. Oxford Health Plan*, 287 F.3d 96, 104 (2d Cir. 2002)).

Review of a claims administrator's eligibility determination under the arbitrary-and-capricious standard is "highly deferential." *Halo*, 819 F.3d at 51. Under that standard, a claims administrator's decision to deny benefits "may be overturned . . . only if the decision is without reason, unsupported by substantial evidence or erroneous as a matter of law." *J.M. v. United Healthcare Ins.*, No. 21 Civ. 6958 (LGS), 2023 WL 6386900, at *3 (S.D.N.Y. Sept. 29, 2023) (quoting *Fay*, 287 F.3d at 104). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010) (internal quotation marks omitted). And in determining whether the claims administrator's decision is adequately supported, the reviewing court is not free to substitute its own judgment for that of the administrator. *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 83-84 (2d Cir. 2009).

By contrast, when the *de novo* standard of review applies, the Court must determine whether the claimant is entitled to the benefits they seek without affording any deference to the

claims administrator's determination.  *Colin D. v. Morgan Stanley Med. Plan*, No. 20 Civ. 9120 (LTS), 2023 WL 6849130, at *10 (S.D.N.Y. Oct. 17, 2023).  Under that approach, the court must review "all aspects of the denial of an ERISA claim, including fact issues," with fresh eyes. *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 245 (2d Cir. 1999).  But even in that posture, the burden generally remains on the claimant to show that they are entitled to benefits under the relevant language of the benefit plan, including when the plan makes medical necessity the operative standard for eligibility.  *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 765 (2d Cir. 2002) ("Where 'medical necessity' is a prerequisite for entitlement to a benefit under an ERISA plan, the burden of proof will generally be on the plan participant.").

Thus, on *de novo* review a federal court effectively "stands in the shoes of the original decisionmaker, interprets the terms of the benefits plan, determines the proper diagnostic criteria, reviews the medical evidence, and reaches its own conclusion about whether the plaintiff has shown, by a preponderance of the evidence, that she is entitled to benefits under the plan." *Quigley v. Unum Life Ins. Co. of Am.*, No. 22 Civ. 5906 (JPO), 2023 WL 6387021, at *5 (S.D.N.Y. Sept. 29, 2023) (internal quotation marks omitted).  In other words, on *de novo* review "[t]he question for the Court is simply whether the decision to deny [the plaintiff's] claim was correct." *Kagan v. Unum Provident*, 775 F. Supp. 2d 659, 670 (S.D.N.Y. 2011) (internal quotation marks omitted).  And in answering that question, the court, absent good cause shown, is "limited to the record in front of the claims administrator" at the time of the adverse benefit determination.  *DeFelice v. Am. Int'l Life Assur. Co. of N.Y.*, 112 F.3d 61, 67 (2d Cir. 1997); *Colin D.*, 2023 WL 6849130, at *10.

### III. Conclusions of Law

The parties' disagreement in this case begins over whether the Court should review United's denial of benefits under the arbitrary-and-capricious standard or under the *de novo* standard. While Richard and Julie do not appear to dispute that the Plan on its face vests United with discretionary authority to make eligibility determinations, they contend that *de novo* review must still apply because United's handling of their claim did not afford them a "full and fair" review in accordance with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1. Pls. Trial Br. at 3-6, 15-17; *see Halo*, 819 F.3d at 51 (holding as a general matter that "when denying a claim for benefits, a plan's failure to comply with the Department of Labor's claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed *de novo* in federal court"); *Hughes v. Hartford Life & Accident Ins. Co.*, 368 F. Supp. 3d 386, 403 (D. Conn. 2019) (observing that *de novo* review applies when a claims administrator failed to provide a full and fair review of a claim for benefits).

The Court, however, does not decide whether United complied with the Department of Labor's regulations or otherwise provided Richard and Julie with a full and fair review of their claim for benefits, because even on *de novo* review, Richard and Julie have failed to prove that K.K. was entitled to coverage for residential treatment at Sedona as of March 19, 2015.[11]

---

[11] The Second Circuit has also explained that "[e]ntitling a claimant to *de novo* review based on a plan's failure to comply with the claims-procedure regulation may be cold comfort if the plan's own compliance failures produced an inadequate administrative record that would prevent a full and fair hearing on the merits." *Halo*, 819 F.3d at 60. Here, Richard and Julie have not advanced any argument that United's alleged failure to afford them a full and fair review had an adverse impact on the development of the record, nor have they asked that the Administrative Record be expanded to include any additional evidence.

**A.      Interpretation of the Plan**

To determine whether Richard and Julie are entitled to coverage for K.K.'s treatment at Sedona after March 18, 2015, the Court starts by conducting a *de novo* interpretation of the relevant language of the Plan and United's applicable guidelines for placement at a Residential Treatment Center.

To begin, the Plan provides coverage only for "Covered Services." AR at 51. For a given treatment to qualify as a Covered Service, the treatment must, among other requirements, be "Medically Necessary." *Id.* The Plan's definition of the term Medically Necessary has seven components, each of which must be met for the definition to be satisfied. *Id.* at 52. Those conditions include that the treatment be "required for the direct care and treatment or management of [the patient's] condition," and that the patient's "condition would be adversely affected if the services were not provided." *Id.* The Plan also imposes a requirement that the treatment sought is "not more costly than an alternative service or sequence of services[] that is at least as likely to produce equivalent therapeutic or diagnostic results." *Id.* In addition, the Plan provides that "[w]hen setting or place of service is part of the review, services that can be safely provided to [the patient] in a lower cost setting will not be Medically Necessary if they are performed in a higher cost setting." *Id.* So for example, "inpatient admission" for treatment would not be Medically Necessary if the treatment "could have been performed on an outpatient basis." *Id.*

The Optum Guidelines provide more tailored standards for determining whether placement at a Residential Treatment Center is appropriate.[12] *See Colin D.*, 2023 WL 6849130, at *15 ("The

---

[12] None of the parties dispute that the Court may consult the Optum Guidelines in determining whether residential treatment is Medically Necessary under the terms of the Plan. *See* Pls. Trial Br. at 11-13; Defts. Supp. Br. at 4; Pls. SUMF ¶ 44. Because the Plan allows United to refer to "clinical guidelines" and "[p]rofessional standards of safety and effectiveness" in

Optum Guidelines are a set of objective and evidence-based health criteria used by medical necessity plans to standardize coverage determinations, promote evidence-based practices, and support members' recovery, resiliency, and wellbeing for behavioral health benefit plans." (alteration adopted, internal quotation marks omitted)).  For continued service at a Residential Treatment Center to be appropriate, an essential requirement is that "[t]he admission criteria continue to be met."  AR at 1557.  The admission criteria for placement at a Residential Treatment Center include a requirement that the "factors leading to admission cannot be safely, efficiently or effectively assessed and/or treated in a less intensive setting."  *Id.* at 1553; *see also id.* at 1556. The Optum Guidelines state, by way of example, that this standard can be met when the patient suffers from: (1) "[a]cute impairment of behavior or cognition that interferes with activities of daily living to the extent that the welfare of the [patient] or others is endangered" or (2) "[p]sychosocial and environmental problems that are likely to threaten the [patient's] safety or undermine engagement in a less intensive level of care without the intensity of services offered in this level of care."  *Id.*  at 1553.  In addition, the Optum Guidelines impose an independent requirement that a patient may only be admitted to a Residential Treatment Center if the patient is "not in imminent or current risk of harm to self, others, and/or property."  *Id.*

Interpreting the Plan's definition of the term Medically Necessary together with the Optum Guidelines' standards for continued placement at a Residential Treatment Center, the Court holds that the operative question in determining a patient's eligibility for benefits in the context of this case is the following: could the patient have been safely, efficiently, and effectively treated in a

---

evaluating whether a service is Medically Necessary for purposes of coverage, AR at 52, the Court agrees that the Optum Guidelines are relevant to evaluating Richard and Julie's claim for benefits in this case.

less intensive or less costly setting?  If the answer to that question is "yes" as of the relevant date, then continued residential treatment is not Medically Necessary under the Plan.

## B.    Application

Richard and Julie assert that to prevail under the *de novo* standard of review, they must "establish that K.K.'s treatment [at a Residential Treatment Center] continued to be [Medically Necessary] as of March 19, 2015" by a preponderance of the evidence.  Pls. Trial Br. at 7; Pls. Opp. Br. at 11.  Under the Court's interpretation of the Plan and the Optum Guidelines applicable to placement at a Residential Treatment Center, Richard and Julie must therefore prove that it is more likely than not that K.K. could not have been safely, efficiently, and effectively treated at a less intensive or less costly setting as of March 19, 2015.  The record evidence they rely on falls short of that mark.[13]

United's determination that residential treatment was no longer Medically Necessary as of March 19 was broadly based on an examination of two related considerations: whether K.K. had shown sufficient improvement during her time at Sedona and whether her treatment could be appropriately continued at a lower level of treatment.  *See* AR at 215 (Dr. Ahluwalia concluding that K.K. "seem[ed] to be working better with others and on her recovery goals," did not "appear to be at risk of harming [herself] or others," and had "no serious medical problems needing 24

---

[13] United and Oxford preemptively argue that their denial of Richard and Julie's claim was not influenced by any conflicts of interest.  Defts. Trial Br. at 22-23.  Because the Court considers Richard and Julie's claim for benefits *de novo*, whether and to what extent United had a conflict of interest is "irrelevant with respect to the Court's consideration of the merits" of the denial decision.  *Gonda v. Permanente Med. Grp., Inc.*, 300 F.R.D. 609, 616 (N.D. Cal. 2014); *see Liyan He v. Cigna Life Ins. Co. of N.Y.*, 304 F.R.D. 186, 188 (S.D.N.Y. 2015) ("In *de novo* review cases, . . . any conflict of interest and procedural irregularities are not *per se* relevant to the merits determination because the district court conducts its own review of the evidence without deferring to the administrator's prior determinations.").  In any event, Richard and Julie have not shown how any potential conflicts of interest impacted United's decision.  *See Callas v. S&P Glob. Inc.*, No. 19 Civ. 1478 (PGG), 2022 WL 255114, at *17 (S.D.N.Y. Jan. 26, 2022).

hour care"); *id.* at 1537 (Dr. Allchin concluding that K.K. had "made progress" in treatment, "had no medical issues," and "was not a danger to self or others," and that her "[s]ymptoms were better"). In concurring with Dr. Ahluwalia's and Dr. Allchin's determinations that continued residential treatment at Sedona was not Medically Necessary as of March 19, 2015, the independent external reviewer relied on similar considerations. *See id.* at 1578 (concluding that K.K.'s medical records did not "reflect acting out behaviors which presented an ongoing significant danger to self or others, which required 24-hour structure and observation" and that K.K.'s symptoms could be managed "equally safely and effectively in a less restrictive setting in the patient's community with appropriately intensive family involvement").

On *de novo* review, ample evidence in the Administrative Record supports United's and the external reviewer's determinations that K.K. could have been treated at a less intensive level of care, such as though a partial hospitalization program, as of March 19, 2015.

When K.K.'s coverage for residential treatment at Sedona began, she was only about a week past a serious suicide attempt. *Id.* at 1190, 1209. Her diagnoses included a mood disorder, oppositional defiance disorder, and a parent-child relational problem. *Id.* at 1076. At that time, she was still at direct risk of further self-harm and required special precautions, including one-on-one monitoring. *Id.* at 1190, 1204, 1209. And she was depressed. *Id.* at 1190, 1209. But by March 19, K.K.'s psychiatrist noted that she reported an "improvement in outlook and ability to focus to task," improvements in her grades, feeling "less irritable," and being "better able to contain her impulses." *Id.* at 1059. K.K. also had no suicidal ideation, psychosis, or feelings of hopelessness by that point. *Id.* And her mood and affect were both within normal limits. *Id.* K.K.'s psychiatrist further assessed that as of March 19, K.K.'s depressive disorder had improved and that her thought process was linear and logical, with no paranoia or delusions. *Id.* K.K.'s

records from her time at Sedona also reflect generally consistent participation in treatment and other program activities, an overall positive attitude towards her peers, few problems with sleep, and perhaps a modest improvement in her behavior towards authority figures, though significant challenges with oppositional defiance remained.

These facts provide strong support for a conclusion under the Optum Guidelines that as of March 19, K.K.—while undoubtedly in need of further mental health treatment—no longer suffered from an acute impairment of behavior or cognition of such a severity that it interfered with her daily living and required around-the-clock structure, or from psychosocial or environmental problems that were likely to undermine her safety or engagement in a less intensive setting. *See id.* at 1553. By extension, these facts support a conclusion under the plain language of the Plan that K.K.'s continued treatment at Sedona was not Medically Necessary as of March 19, 2015, because she could have received appropriate treatment though the partial hospitalization program that United recommended. *See id.* at 52. In other words, these facts indicate that K.K. could have been safely, efficiently, and effectively treated in a less intensive or less costly setting than residential care, such as through a partial hospitalization program.

Richard and Julie's arguments to the contrary are unpersuasive. Richard and Julie rely mainly on the fact that K.K. had attempted suicide just over a month before Dr. Ahluwalia's Initial Adverse Determination, and that K.K. self-harmed on multiple occasions during March 2015, including on or around March 18—just before Dr. Ahluwalia's determination. Pls. Trial Br. at 8-11. Richard and Julie also point out that on March 22, K.K. told a Sedona staff member that she "always has the urge" to self-harm but "was not having any feeling then of self-harming." AR at 1039. Based on those facts, Richard and Julie contend that Dr. Ahluwalia and Dr. Allchin erred in determining that K.K. was not a current danger to herself for purposes of determining whether

residential treatment was Medically Necessary under the Plan and the Optum Guidelines.  Pls. Trial Br. at 8-11; *see* AR at 215 (Dr. Ahluwalia noting that K.K. did not "appear to be at risk of harming [herself] or others"); *id.* at 1537 (Dr. Allchin observing that K.K. "was not a danger to self or others").

As United and Oxford observe, Richard and Julie's contention that K.K. was a current danger to herself as of March 19 for purposes of determining coverage is in tension with the language of the Optum Guidelines and the parties' agreement that coverage for residential treatment was proper between February 21 and March 18.  Defts. Supp. Br. at 10-11.  Recall that under the Optum Guidelines, a requirement for admission to or continuation at a Residential Treatment Center is that the patient "is *not* in imminent or current risk of harm to self, others, and/or property." AR at 1553 (emphasis added).  So if K.K. had been a current danger to herself between February 21 and March 18, then residential treatment at Sedona would not have been appropriate under the Optum Guidelines.  The parties, however, agree for purposes of this disposition that coverage for residential treatment was proper throughout that timeframe, despite the close temporal proximity to K.K.'s suicide attempt and her instances of self-harm in early March.  As a result, there appears to be considerable tension between accepting that K.K. met the criteria for treatment at Sedona in late February (days after her suicide attempt) and early-March (around the same time she was self-harming), and holding that United erred in concluding that she was not a current danger to herself for purposes of determining coverage as of March 19 in light of a single additional instance of self-harm that does not appear to have been greater in severity than prior episodes.  Alternatively, if K.K. *was* a current danger to herself as of March 19 for purposes of determining coverage, then that conclusion would appear to undermine Richard and Julie's position that continued residential treatment was appropriate under the Optum Guidelines.

27

The Court ultimately agrees, however, that a patient's risk to their own welfare—at least short of a current or imminent risk of self-harm for purposes of the Optum Guidelines—is a factor that can support an entitlement to coverage for residential treatment under the Plan. That is the necessary implication of the Plan's definition of medical necessity and the Optum Guidelines' admission and continuation criteria for Residential Treatment Centers, which collectively turn on whether a patient can be safely, efficiently, and effectively treated in a less intensive or less costly setting. *See id.* at 52 (the Plan providing that treatment is Medically Necessary only if it is "required for the direct care and treatment or management of [the patient's] condition" and is "not more costly than an alternative service or sequence of services[] that is at least as likely to produce equivalent therapeutic or diagnostic results"); *id.* at 1553 (the Optum Guidelines providing that residential treatment is appropriate only if the "factors leading to admission cannot be safely, efficiently or effectively assessed and/or treated in a less intensive setting"). But even accepting Richard and Julie's premise that an ongoing risk to K.K.'s safety would support, rather than undermine, their claim for benefits, the Court does not find the record evidence of K.K.'s self-harm sufficient to demonstrate a continued entitlement to residential treatment coverage as of March 19. That is so for a number of reasons.

First, all but one episode of self-harm that Richard and Julie point to occurred in February and early March of 2015, weeks before Dr. Ahluwalia's Initial Adverse Determination on March 20. As noted, those instances consist of: (1) K.K.'s apparent suicide attempt on February 15 by drinking half a bottle of window cleaner, *id.* at 1221; Pls. SUMF ¶ 28; and (2) her self-harm with an earring on March 1 and 2, AR at 1167, 1158-59; Pls. SUMF ¶ 28.[14] K.K. also told her therapist

---

[14] The portion of the Administrative Record that Richard and Julie object to, *see supra* n.10, further notes that on March 3, 2015, K.K. "self-harmed in [the] shower" by using a "finger

on February 23 that she was not ready to come off one-on-one observation because she felt that she might drink cleaner again and expressed further thoughts of self-harm on March 3. AR at 1152-53, 1204; Pls. SUMF ¶ 28.

There can, of course, be no question that these incidents were serious—particularly the February 15 incident, which resulted in hospitalization and required K.K. to be placed on precautionary status. But even so, K.K.'s psychiatrist at Sedona assessed that by March 19, her mood and affect had returned to normal limits, that she lacked any suicidal ideation or hopelessness, and that she was "better to able to contain her impulses." AR at 1059. As Richard and Julie put it, the Court must "[p]roperly target[] [its] analysis to K.K.'s condition as of March 19, 2015," not any earlier date. Pls. Trial Br. at 7. Accordingly, the Court finds that these earlier instances of self-harm carry little weight in determining whether K.K. could have continued her treatment at a less intensive or less costly level of care as of March 19.

Second, the record evidence of K.K.'s alleged episode of self-harm on or about March 18 and its impact on her ability to tolerate a step down in treatment is vague at best. There was no contemporaneous report or observation of that incident. Instead, K.K. reported it several days later, on March 22. AR at 1039. And in contrast to K.K.'s prior instances of self-harm, the record evidence concerning the nature of this episode and its significance is virtually nonexistent. A Sedona staff member reported that K.K. "showed [them] where, her upper thigh," but otherwise provided no description of the nature or severity of the incident, apart from noting K.K.'s characterization of it as self-harm and observing that K.K. was visibly upset when reporting it. *Id.*

_____

nail to open up previous superficial cuts [from an] earring she stole from another peer[]." AR at 181. In light of their broad objection to this portion of the record, it is unclear whether Richard and Julie seek to have the Court consider this incident of self-harm as well. But either way, K.K.'s history of self-harm in March 2015 does not demonstrate an entitlement to coverage for the reasons that the Court will explain, even taking into consideration this additional incident.

The parties have not identified any other reliable evidence in the record concerning the severity of this incident, and the Court has not found any. So given the lack of reliable evidence concerning the nature and severity of this event, the Court does not find that it undermines the assessments of Dr. Ahluwalia and Dr. Allchin that K.K. was not a danger to herself or others as of March 19, or otherwise provides more than minimal support for a finding that residential treatment was Medically Necessary as of March 19.

That conclusion is supported by the fact that, by all indications, the March 18 incident and the March 22 report were dogs that did not bark. Whereas Sedona immediately placed K.K. on precautionary status in response to her prior episodes of self-harm, there is no evidence that they did so in this instance. And K.K.'s individual therapy session notes from the day following the March 22 report of the March 18 incident made no mention of ongoing issues with self-harm or any risk of the same, instead highlighting a discussion of "strategy of [] how to avoid [] engaging in argumentation with adults" and noting that K.K. received feedback to facilitate advancement to the next phase of her treatment program. *Id.* at 1036. K.K. also continued participating in her daily activities as normal in the days immediately following March 22, *see, e.g.*, *id.* at 1020, with one Sedona staff member highlighting that K.K. "was her normal spunky, zealous self, happy and poised," *id.* at 1019. Plus, in their written evaluations of whether K.K. should progress to phase two of the program, Sedona staff members made no mention of any ongoing risks of self-harm in their assessments, focusing instead on less serious issues like K.K.'s defiance toward authority figures, difficulty following rules, and failure to keep her room clean. *Id.* at 1018, 1022-23. And on March 23, the day after K.K.'s report of the March 18 incident, another Sedona staff member recommended that K.K. move up to phase two, highlighting K.K.'s improvements in leadership and therapy, her ability to manage her behavior in healthy ways, her improvements in behavior

toward staff members, and her hopefulness for the future. *Id.* at 1033. Sedona then determined that K.K. had made sufficient progress to "move up in phase" as of March 25, a determination that Sedona had previously reversed following K.K.'s prior episodes of self-harm. *Id.* at 1017. In fact, the only mention of self-harm in K.K.'s medical records immediately following March 22 is in a March 26 psychiatric consultation report, which, in addition to noting that K.K.'s mood and affect were within normal limits and that she had no suicidal ideation, commented only that K.K. felt "as if she can go to staff if she feels she has thoughts of self harm." *Id.* at 1010. So to the extent that the record reveals anything about the nature of the March 18 incident and the March 22 report, it is that these events were not a significant cause for concern on the part of K.K.'s providers or seen as an indication that K.K.'s mental health was not improving. Thus, the March 18 incident and the March 22 report provide only minimal support for a conclusion that K.K. required continued residential treatment as of March 19.

Third and most fundamentally, it is not axiomatic that any degree of continued struggle with self-harm would mean that K.K.'s residential treatment at Sedona remained Medically Necessary as of March 19. As noted, the language of the Plan and the Optum Guidelines provide that continued coverage is only appropriate when the patient could not be safely, efficiently, and effectively treated via less intensive or less costly care. *See id.* at 52, 1553. That standard is an inherently comparative one: the key is not whether residential treatment is helpful to the patient, but whether it is necessary in light of the available alternatives. And in this case, United determined that it would be appropriate for K.K. to continue treatment through a partial hospitalization program, just one step in intensity below residential treatment. *Id.* at 215. So even if K.K. presented some risk of further self-harm as of March 19, Richard and Julie would still need to show that the relevant risks could not have been safely, efficiently, and effectively managed in

a less intensive or less costly setting such as a partial hospitalization program, or that the presence of the self-harm risk otherwise indicated that K.K. had not improved enough to allow treatment at a lower level of care.

Yet Richard and Julie present no convincing argument and identify no persuasive evidence in the record bridging that crucial gap. *See* Pls. Supp. Br. at 2-3 (citing only the March 22 report of self-harm and thoughts thereof in response to the Court's request for clarification regarding the specific facts and circumstances in the Administrative Record indicating whether K.K. required residential treatment as of March 19). They do not, for instance, present opinions from any medical professionals or other qualified experts to the effect that, for purposes of the Plan's definition of medical necessity, residential treatment was "required for the direct care and treatment or management of [K.K.'s] condition" as of March 19, or that K.K.'s "condition would be adversely affected" if treatment continued through a partial hospitalization program or other less intensive setting. AR at 52. Nor have they identified any documentation from K.K.'s providers at Sedona suggesting that, by virtue of a continued struggle with self-harm or otherwise, residential treatment was "not more costly than an alternative service or sequence of services, that [was] at least as likely to produce equivalent therapeutic or diagnostic results." *Id.* They also have not presented any expert opinions or other evidence showing that, for purposes of the Optum Guidelines, K.K. was not capable of being safely, efficiently, and effectively treated in a less intensive setting than a Residential Treatment Center. *Id.* at 1553.

Richard and Julie, in other words, have failed to identify evidence supporting the key analytic step between K.K.'s instances of self-harm (and other behavioral and emotional issues) and the ultimate conclusion that the Court must reach in order to sustain their claim for benefits—that K.K. could not have been safely, efficiently, and  effectively treated in a less intensive or less

costly setting, such as through a partial hospitalization program, as of March 19, 2015. *Id.* at 52, 1553. Indeed, Richard and Julie's briefing barely engages at all with the key question of how the facts and circumstances of K.K.'s treatment at Sedona contained in the Administrative Record satisfy these essential criteria for medical necessity under the Plan and the Optum Guidelines as of March 19. *See* Pls. Trial Br. at 6-13; Pls. Opp. Br. at 8-13; Pls. Reply Br. at 7-9; Pls. Supp. Br. at 3-4.[15]

Richard and Julie do, on the other hand, point to documents prepared by K.K.'s *prior* mental healthcare providers that they submitted in connection with their internal and external appeals of Dr. Ahluwalia's Initial Adverse Determination. Pls. Reply Br. at 5-7 (arguing that "K.K.'s treating clinicians indicated she still needed residential mental health treatment as of March 18, 2015"). The Court, however, declines to credit those documents as persuasive evidence that residential treatment remained Medically Necessary as of March 19.

The first document is a two-sentence letter written by Jon Doyle, an Assistant Principal at the Christ Lutheran School, dated August 2015. AR at 247. As an initial matter, Richard and Julie have presented no evidence regarding Mr. Doyle's medical qualifications or whether he based his letter on his own evaluation of K.K.'s mental health status and symptoms. Instead, Mr. Doyle's letter referred to a recommendation made by an unidentified "counselor[]" at the Christ Lutheran School in the spring of 2014—well before March 19, 2015—based on unspecified "academic and social issues" that K.K. was experiencing at that time. *Id.* Mr. Doyle noted that "it was

---

[15] Richard and Julie maintain that they "went through United's own internal guidelines for continued residential care and established that K.K. met each of the criteria for continued care as of March 19, 2015." Pls. Reply Br. at 7. But their trial brief did not attempt to analyze the Plan's own seven-part definition of medical necessity and, despite analyzing a number of requirements under the Optum Guidelines, failed to engage with the key factor of whether K.K. could have safely, efficiently, and effectively received treatment at a less intensive level of care as of March 19. *See* Pls. Opp. Br. at 11-13.

recommended" that K.K. "receive a full evaluation and check into a clinic," but stopped short of stating whether that that recommendation included residential treatment. *Id.* Even if the Court were to construe the "check into a clinic" language as a recommendation by Mr. Doyle and the unnamed counselor that K.K. receive residential treatment, Mr. Doyle's letter—given its apparent reliance on a temporally distant observation of K.K.'s symptoms, its lack of detail, and its questionable medical foundation—would fail to meaningfully support a conclusion that K.K. could not have been properly treated in a less intensive or less costly setting as of March 19, 2015.

The second document is the Master Treatment Plan dated May 12, 2014, created in connection with K.K.'s treatment at Paradigm Malibu. *Id.* at 249-53. To reiterate, that document summarized K.K.'s diagnoses as follows:

> [K.K.'s] diagnosis recently changed from Anxiety and Eating Disorder to Delusional Disorder. [K.K.] is displaying behavior that is incongruent with reality. [K.K.] appears more delusional in how she perceives attention from males, the incorrect history regarding her family, and some of the blatant lies she tells on a daily basis. [K.K.] is displaying behavior that is evidence she is not fully experiencing reality. [K.K.] displays other delusional behavior such as inappropriate jealousy of her dad's girlfriend and other interpretation of reality that cannot be explained. For criteria, [K.K.'s] delusions are based in real life events but they have not happened to her. Although her parents and staff have initially assumed that this was based in lies and manipulation, it now appears that [K.K.] has little control over the delusions that she is experiencing/creating.

*Id.* at 249. The same document also noted that K.K. "had a recent decline in her functioning as evidenced by thoughts of suicide, self-harm through cutting, and restriction/purging related to eating." *Id.* It further described some of K.K.'s delusional behaviors as "false and unshakable," and noted that K.K. suffered a from major depressive disorder as evidenced by, among other symptoms, insomnia, "feelings of worthlessness," "recurrent thoughts of death," a depressed and irritable mood, and a "diminished ability to concentrate." *Id.* at 252. The Paradigm Malibu Master Treatment Plan paints a vivid picture of a teenager in crisis and could provide support for finding

that the around-the-clock structure and observation available at a Residential Treatment Center was necessary as of May 2014.

But that document sheds little to no light on whether K.K. required such an intensive level of care as of March 19, 2015. While the Master Treatment Plan stated that K.K. experienced suicidal thoughts, had recurrent thoughts of death, and had a depressed and irritable mood, K.K.'s psychiatrist at Sedona reported that as of March 19, 2015, she had no suicidal ideation or feelings of hopelessness, that her mood was within normal limits, and that she was less irritable. *Id.* at 1059. And whereas the Master Treatment Plan assessed that K.K. suffered from a serious delusional disorder and had, at best, a tenuous grip on reality, her psychiatrist at Sedona documented that, as of March 19, 2015, she had no delusions or paranoia, and instead displayed a linear and logical thought process. *Id.* Finally, in contrast to the insomnia reflected in the Master Treatment Plan, K.K.'s medical records from her time at Sedona in February and March 2015 show only minimal problems with sleep. Accordingly, the Court cannot credit the Paradigm Malibu Master Treatment Plan as probative evidence of K.K.'s ability or inability to appropriately receive treatment through a less intensive or less costly level of care than residential treatment as of March 19, 2015. *See Fichtl v. First Unum Life Ins. Co.*, No. 22 Civ. 6932 (JLR), 2024 WL 1300268, at \*11 (S.D.N.Y. Mar. 26, 2024) ("[O]n *de novo* review of an ERISA benefits determination, a district court is 'free to evaluate [a treating physician's] opinion in the context of . . . the compatibility of the opinion with the other evidence.'" (quoting *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 135 (2d Cir. 2001))).

Richard and Julie also rely on the Discharge Summary of June 24, 2014, created by Paradigm Malibu when K.K. left the program. AR at 255-57. This document contains the same explanation of K.K.'s diagnoses as the Master Treatment Plan and provides a number of

summaries concerning her progress during the forty-four days she spent at Paradigm Malibu. *Id.*

Yet apart from reflecting a degree of progress during the Paradigm Malibu program, this document also sheds little to no light on K.K.'s treatment needs as of March 19, 2015, given the temporal distance and the availability of contemporaneous medical records painting a substantially more positive picture of her mental health as of that later date. It is also noteworthy that Paradigm Malibu's Discharge Summary did not state that residential treatment for K.K. was necessary or even recommended, and instead suggested placing K.K. in a new middle school and continuing treatment through an "Intensive Outpatient Program," a level of care lower than even the partial hospitalization program that United determined K.K. could appropriately transition to as of March 19, 2015. *Id.* at 257.[16] Paradigm Malibu's Discharge Summary, therefore, does not support Richard and Julie's claim for benefits in this case.

Relatedly, Richard and Julie point to the August 21, 2015, letter authored by Dr. Nalin and Dr. Sager, the clinical director/co-founder and medical director, respectively, of Paradigm Malibu. *Id.* at 259. In that letter, Dr. Nalin and Dr. Sager noted that K.K. attended Paradigm Malibu from May 12, 2014, to June 24, 2014, where she "received psychiatric care to help improve her ability to manage her emotions and stabilize some of her self-harming behavior." *Id.* Dr. Nalin and Dr. Sager claimed that "[w]hile [K.K.] made progress during her stay, it was strongly recommended that she participate in a long term residential program and that she continue to receive therapeutic and psychiatric services in a highly structured setting." *Id.*

This letter is also unpersuasive, not to mention seriously lacking in credibility and veracity. First, Dr. Nalin and Dr. Sager's claim that residential treatment in a highly structured setting was

---

[16] Richard and Julie followed Paradigm Malibu's recommendation, enrolling K.K. at a new middle school and beginning therapy with Mr. Golden on an outpatient basis. AR at 227-28.

"strongly recommended" for K.K. following her stay at Paradigm Malibu is inconsistent with (if not contradicted by) the Paradigm Malibu Discharge Summary, which recommended continued individual therapy and treatment through an Intensive Outpatient Program, while making no recommendation of further treatment at a Residential Treatment Center. *Id.* at 257. Their claim is also inconsistent with Richard and Julie's first-level appeal letter, which stated that the Paradigm Malibu team had "recommended . . . to get [K.K.] into a new middle school, so she could have a fresh start," and did not mention that Paradigm Malibu had "strongly recommended" continued residential treatment. *Id.* at 227. These inconsistencies aside, even if a strong recommendation of continued residential treatment *had* been made at the time K.K. completed her stay at Paradigm Malibu, that recommendation would carry little weight in determining whether that level of treatment was still necessary as of March 19, 2015. Indeed, in explaining their supposed recommendation of continued residential treatment, Dr. Nalin and Dr. Sager's letter referred to K.K.'s diagnoses of a delusional disorder and major depressive disorder as of May and June 2014, and did not take account of K.K.'s improved mental health status as of March 19, 2015, or purport to analyze K.K.'s contemporaneous medical records from her time at Sedona. The Court therefore does not place weight on Dr. Nalin and Dr. Sager's letter.

Finally, Richard and Julie rely on an August 10, 2015, letter by Mr. Golden, the Licensed Clinical Social Worker who provided individual and family therapy to K.K. between June 27, 2014, and December 16, 2014. *Id.* at 261. Mr. Golden's letter states that K.K. had "a history of self-harm, suicidal ideation and depressed mood." *Id.* The letter further notes that during his treatment of K.K., she "continued to be a high risk for self-harm" and "remained depressed and very impulsive, showing poor judgment and poor insight." *Id.* Mr. Golden also notes that K.K. "had thoughts she wished she were dead and expressed feelings of hopelessness and helplessness,"

and "struggled with interpersonal relationships." *Id.* Again, however, Mr. Golden's letter is based on observations made during a course of treatment that took place months prior to the relevant coverage termination date. And several of Mr. Golden's key observations concerning K.K.'s mental health—such as her suicidal ideation and hopelessness—are not consistent with the contemporaneous evidence of her condition as of March 19, 2015. Finally, Mr. Golden's letter stops short of opining that K.K. required residential treatment, stating only that it was his "hope that with continued treatment [K.K.] will show improvement in her mood and her behavior." *Id.* The Court therefore finds that Mr. Golden's letter does not provide evidentiary support for Richard and Julie's claim for benefits.

Richard and Julie's remaining arguments focus on various criteria in the Optum Guidelines that they contend are satisfied in this case. Pls. Trial Br. at 11-13. For example, they note that at Sedona, "K.K. was being treated pursuant to a treatment plan focused on addressing her mental health issues," which they say satisfies the Optum Guidelines condition that "[t]he 'why now' factors leading to admission have been identified and are integrated into the treatment and discharge plans." *Id.* at 11. They also note that "K.K.'s parents participated in family therapy," which aligns with the Optum Guidelines requirement that "[t]he member's family and other natural resources are engaged to participate in the member's treatment as clinically indicated." *Id.* at 12. Richard and Julie further argue that several other Optum Guidelines criteria were met as of March 19, 2015, such as the requirements that her care at Sedona was "being provided with sufficient intensity to address [her] treatment needs" and that treatment at Sedona was "not primarily for the purpose of providing custodial care." *Id.* at 11-13.

The fact that K.K.'s treatment at Sedona may have satisfied these other conditions for coverage under the Optum Guidelines is not outcome determinative. Instead, what continues to

matter under the Optum Guidelines is whether K.K. could have been safely, efficiently, and effectively treated in a less intensive setting as of March 19, 2015.  AR at 1553, 1556.  So even if some of the other Optum Guidelines criteria were met as of March 19, coverage for K.K.'s residential treatment at Sedona would still be inappropriate if she could have been properly treated in a less intensive setting.  Because Richard and Julie have ultimately failed to demonstrate that, as of March 19, K.K. could not have been safely, efficiently, and effectively treated at a less intensive level of care, the Optum Guidelines do not support their claim for benefits even if some of the remaining conditions for coverage may have been met.

*  *  *

To prevail on their claim for benefits, Richard and Julie had to prove by a preponderance of the evidence that K.K.'s treatment at a Residential Treatment Center was Medically Necessary under the terms of the Plan and the Optum Guidelines as of March 19, 2015.  There is no doubt, as United itself recognized, that K.K. still needed mental health treatment as of that date: K.K. continued to struggle with oppositional defiance and other behavioral issues, had a fraught relationship with her parents, and was still experiencing emotional problems as well.  It is therefore unsurprising that although United denied continued coverage for residential treatment as of March 19, it approved coverage for K.K. to continue receiving treatment through a partial hospitalization program from that date onwards.  The Court also does not rule out that despite K.K.'s progress, some risk of self-harm remained as of March 19.

But at the end of the day, "the point isn't whether [K.K.] was a picture of health.  Neither is it whether she was ready to stop treatment altogether.  It is whether she had *improved so little* that she continued to need the same kind of care as she had received for [twenty-six days at Sedona] or instead could handle a step down in treatment."  *Alexandra H. v. Oxford Health Ins., Inc.*, 763 F.

39

App'x 865, 869 (11th Cir. 2019) (Sutton, J.).    To that end, the relevant portions of the Administrative Record, considered holistically, do not demonstrate by a preponderance of the evidence that K.K.'s mental health outlook was so dire as of March 19 that continued treatment at a Residential Treatment Center was Medically Necessary under the terms of the Plan and the Optum Guidelines.    Instead, the relevant portions of the record demonstrate that as of March 19 K.K.'s mental health had improved to the point that she could handle a step down in the intensity of her treatment.    Accordingly, on *de novo* review of United's decision denying benefits for K.K.'s residential treatment at Sedona from March 19, 2015, to August 4, 2015, United and Oxford are entitled to judgment on Richard and Julie's First Cause of Action.

## IV.  Conclusion

For these reasons, the Court will enter judgment in favor of United and Oxford on the First Cause of Action alleged in the Amended Complaint.    United and Oxford shall submit a proposed judgment on or before March 27, 2025.    Richard and Julie's request to submit supplemental briefing on the issues of prejudgment interest and attorneys' fees, Pls. Opp. Br. at 14, is denied as moot.    The Clerk of Court is respectfully directed to close Docket Numbers 80 and 93.

SO ORDERED.

Dated: March 20, 2025
    New York, New York

JOHN P. CRONAN
United States District Judge